## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

_____

UNITED STATES OF AMERICA and )
PEOPLE OF THE VIRGIN ISLANDS, )
                       )
      **v.**              )       **Criminal Action No. 2015-0040**
                       )
WINSTON CURTIS VENNER, )
                       )
        **Defendant.**      )
_____)

Attorneys:
**Alphonso Andrews, Esq.,**
St. Croix, U.S.V.I.
      *For the Government*

**Omodare B. Jupiter, Esq.,**
**Kia Danielle Sears, Esq.,**
St. Croix, U.S.V.I.
      *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the "Motion to Suppress Statements and

Physical Evidence" (Dkt. No. 28) filed by Defendant Winston Curtis Venner ("Defendant") and

the "United States' Response in Opposition to Defendant's Motion to Suppress" (Dkt. No. 31).

For the reasons discussed below, the Court will deny Defendant's Motion to Suppress.

### I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

On December 15, 2015, the grand jury returned an Indictment against Defendant charging

the following: (1) Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C.

---

[1] The Court bases the factual background in this section on the record established at the suppression hearing. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

§ 922(g)(1); (2) Possession of Ammunition by a Convicted Felon in violation of 18 U.S.C.

§ 922(g)(1); (3) Unauthorized Possession of a Firearm in violation of 14 V.I.C. § 2253(a); and (4)

Unauthorized Possession of Ammunition in violation of 14 V.I.C. § 2256(a). (Dkt. No. 22).[2]

On January 11, 2016, Defendant filed the instant Motion seeking to suppress "[a]ll physical evidence and statements illegally taken or flowing from the illegal search and seizure of [Defendant]" on the grounds that the physical evidence was obtained in violation of Defendant's Fourth Amendment rights and Defendant's statements were obtained in violation of his *Miranda* rights. (Dkt. No. 28 at 1, 6-7). The United States (the "Government") filed its Opposition on January 31, 2016, arguing that the stop was justified based on a traffic violation—specifically, turning without signaling—and that no *Miranda* violations occurred. (Dkt. No. 31).

A suppression hearing was held on February 12, 2016, at which Virgin Islands Police Department Detective Darryl Walcott testified for the Government. At the suppression hearing, Defendant challenged, for the first time, the constitutionality of 20 V.I.C. § 495(d), and Government counsel acknowledged that certain questions posed by the Court would require supplemental briefing. Based on these issues and pursuant to the timeframe requested by Defendant, on February 17, 2016, the Court entered an Order requiring supplemental briefing. (Dkt. No. 42). In accordance with that Order, the Government filed its "Supplemental Response in Opposition to Defendant's Motion to Suppress" (Dkt. No. 44);[3] Defendant filed his "Brief in

---

[2] Prior to the Indictment, the Government had filed a Complaint against Defendant that set forth the same Counts and included an Affidavit from Special Agent Steven Travis Strickland with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives. (Dkt. No. 1).

[3] In its Supplemental Response in Opposition to Defendant's Motion to Suppress, the Government attached a Crime Scene Evidence Report prepared by Detective Luis Cedano that gives an additional account of the events that occurred after Detective Walcott stopped Defendant's jeep. (*See* Dkt. No. 44-1). Defendant objects to the Crime Scene Evidence Report on the basis that it

Support of Motion to Suppress Physical Evidence" (Dkt. No. 45); the Government filed its "Response to Defendant's Brief in Support of Motion to Suppress" (Dkt. No. 46); Defendant filed his "Supplemental Motion to Suppress Statements and Physical Evidence" (Dkt. No. 47); and lastly, Defendant filed his "Reply to Government's Response to Defendant's Brief in Support of Motion to Suppress" (Dkt. No. 49). Briefing concluded on April 5, 2016.

The following facts emerged from the record established at the hearing. Shortly before 11:00 p.m. on July 12, 2015, Detective Walcott was on mobile patrol with Lieutenant Matthews in an unmarked police vehicle in the Christiansted area. (Transcript of Evidentiary Hearing (Dkt. No. 43) ("Tr.") 7). Detective Walcott and Lieutenant Matthews were on North Shore Road driving north towards a stoplight when Detective Walcott heard rapid gunfire coming from the Harbor View apartment complex. (Tr. 8).[4] Approximately ten seconds after hearing the gunfire, Detective Walcott observed a red jeep driving away from the Harbor View area toward North Shore Road (traveling from east to west). (Tr. 8). When Detective Walcott reached the stoplight, he turned east onto the Harbor View road, towards the direction of the gunfire. (Tr. 8-9). As he was turning, he saw the jeep turn off of the Harbor View road with a jerking motion, and onto North Shore Road (traveling in a southerly direction). (Tr. 9).[5] Shortly after turning onto North Shore Road, however,

---

"was not entered into evidence or testified about at the evidentiary hearing. The officer who created that report did not testify and [Defendant] did not have an opportunity to cross-examine him." (Dkt. No. 47 at 2). Defendant's objection is sustained. Accordingly, in ruling on Defendant's Motion the Court has not considered any of the information contained in the Crime Scene Evidence Report.

[4] Detective Walcott refers to the road as both "North Side Road" and "North Shore Road." The Court will refer to the road as "North Shore Road."

[5] Detective Walcott testified that the jeep made the turn onto North Shore Road without using its signal light, but did not expressly address whether Defendant used another type of signal, such as a hand signal, when turning. (Tr. 9).

3

the jeep changed course and proceeded to travel down Rattan Road in a westerly direction. (Tr. at 9, 50-51).[6]

After observing the jeep, Detective Walcott turned the unmarked patrol vehicle around, activated its lights and siren, and stopped the jeep as it was traveling west on Rattan Road. (Tr. 11-12). Detective Walcott testified that his decision to stop the jeep was "[b]ased on the movement of the vehicle, and the illegal turn without using the signal light, it reared a suspicion. And also being that the vehicle was coming from the area of where the rapid gunfire was . . . taking place." (Tr. 12).

Once Detective Walcott stopped the vehicle, Defendant came out of the jeep without being asked, closed the door, and stood next to the jeep. (Tr. 13).[7] Detective Walcott told Defendant to stop, then walked around the door of his patrol car to approach Defendant. (Tr. 14). Detective Walcott identified himself and told Defendant that he had been stopped because he had "made a turn without using his signal light, and that he was coming from the area of where rapid gunfire . . . had happened." (Tr. 14). Detective Walcott asked Defendant whether he knew anything about the gunfire, to which Defendant responded "yes, that he heard the gun shots were fired." (Tr. 14-15). Detective Walcott then asked Defendant whether he had any firearms or illegal items in the jeep and whether he had a license to carry a firearm in the U.S. Virgin Islands. (Tr. 15). Defendant

---

[6] On direct examination, Detective Walcott testified that the jeep turned onto North Shore Road into the wrong lane of traffic, and cut through a gas station parking lot to reach Rattan Road. (Tr. 11). On cross examination, Detective Walcott testified that in his police report and probable cause fact sheet, he stated that the jeep turned suddenly onto North Shore Road and reversed back on North Shore Road before traveling west down Rattan Road. (Tr. 50, 53). Detective Walcott acknowledged that neither his police report nor the probable cause fact sheet mention the jeep cutting through the gas station parking lot to reach Rattan Road. (Tr. 51, 53).

[7] On cross examination, Detective Walcott testified that neither his police report nor probable cause fact sheet mention that Defendant was outside of the vehicle during the interaction with Detective Walcott. (Tr. 54).

responded "no" to both inquiries. (Tr. 15). During this interaction, Detective Walcott testified that he was using a normal tone of voice, he was standing about two to three feet in front of Defendant, and his firearm remained holstered. (Tr. 15-16).

Detective Walcott next asked Defendant if he could search the vehicle, and Defendant replied "no." (Tr. 17). At that point, Detective Walcott walked around the jeep to the front passenger-side window and shined his flashlight through the open window. (Tr. 17). Using the flashlight, Detective Walcott observed "a black bag with a partially rusted extended magazine." (Tr. 18). Detective Walcott testified that when he saw the object in the bag, "it immediately rang a bell in my head, because I have seen one of these magazines before in my career. I have actually recovered one just like it. . . . [p]robably sometime earlier in the year." (Tr. 21).

After observing the magazine, Detective Walcott yelled "gun" to alert Lieutenant Matthews, and Lieutenant Matthews immediately handcuffed Defendant and instructed him to sit on the curb. (Tr. 22). Detective Walcott called 911 and requested a forensic unit to recover the evidence. (Tr. 22). The forensic officer, Detective Luis Saldano, arrived and photographed the scene. (Tr. 23). Detective Saldano went into the jeep and retrieved the magazine that Detective Walcott had observed and discovered that the magazine was connected to a .380 Cobray semi-automatic weapon. (Tr. 24). The firearm was loaded with 17 bullets, and two additional bullets were also discovered in the bag. (Tr. 25, 37). A search of the jeep ensued that revealed marijuana, plastic baggies, and a digital scale. (T. 29-32, 35).

## II.    DISCUSSION

### A.    The Initial Stop

Defendant asserts that Detective Walcott illegally stopped his jeep on the night of the arrest because he broke no traffic law, and Detective Walcott lacked reasonable suspicion to stop

5

Defendant based on hearing the gunshots. (Dkt. No. 28 at 4-5; Dkt. No. 47 at 8-11). The Government counters that the stop was legal both because Defendant made an illegal turn by not signaling and because Detective Walcott possessed reasonable suspicion of criminal activity when he saw Defendant drive erratically away from gunfire. (Dkt. No. 44 at 2). Under the circumstances here, the Court concludes that Detective Walcott had the requisite reasonable suspicion to stop the jeep.[8]

### 1.   Applicable Legal Standards

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (quotations omitted). The Third Circuit has found that "the Terry reasonable suspicion standard applies to routine traffic stops" based on suspected traffic offenses. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). The same reasonable suspicion standard applies when police stop a vehicle based on suspected criminal activity that is unrelated to a traffic violation. *See United States v. Goodrich*, 450 F.3d 552, 553 (3d Cir. 2006) (holding that police officers satisfied the *Terry* reasonable suspicion standard when they stopped a vehicle whose occupants were suspected of a nearby theft).

It is well established that "[r]easonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion

---

[8] Because the Court concludes that the stop was supported by reasonable suspicion of criminal activity associated with the gunfire, the Court need not address the alleged traffic violation.

6

necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330). "A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). However, the police officer must demonstrate that the stop was based on something more than an "inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 27) (quotations omitted). "Reasonable suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "An officer cannot conduct a *Terry* stop simply because criminal activity is afoot. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) (internal citation omitted). In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow,* 490 U.S. at 8 (quoting *Cortez*, 449 U.S. at 417).

### 2.  Analysis

The Court finds that the uncontested facts in the record are sufficient to establish the requisite reasonable suspicion to stop Defendant's jeep. The record shows that it was close to 11:00 p.m. when Detective Walcott heard rapid gunfire coming from the Harbor View apartment area. (Tr. 7-9). He observed the jeep driving away from the Harbor View area approximately ten seconds

after the gunshots. (Tr. 46). As the jeep approached the intersection,[9] it turned south onto North Shore Road with a sudden jerk and without using its signal light, which Detective Walcott characterized as an "erratic sudden turn." (*See* Tr. 9, 50). Shortly after turning south onto North Shore Road, the jeep changed direction, came back to Rattan Road, and began traveling west. (Tr. at 9, 50-51). There is no evidence that any other cars were in the area, and Detective Walcott specifically testified that there was no traffic in the direction that the jeep traveled. (Tr. 51).[10]

In concluding that these facts are sufficient to establish reasonable suspicion associated with the gunfire, the Court finds the Third Circuit decision in *Goodrich* to be instructive. In *Goodrich*, police received a call at approximately 11:20 p.m. that a possible theft of a chemical ingredient was in progress. 450 F.3d at 554. The caller stated that "there [were] two people just carrying some kind of buckets or something" and they are "over behind R & M Gas right now loading into some kind of a vehicle." *Id.* Police arrived in the vicinity of the R & M gas station approximately seven minutes later and saw one vehicle about a block or two away. *Id.* The officers stopped the vehicle and ultimately discovered evidence tying the occupants to the reported theft. *Id.* at 556. The Third Circuit held that the stop was supported by reasonable suspicion based on four key factors: (1) the events took place in a high-crime area; (2) the late time of day; (3) the close geographical and temporal proximity to the suspected criminal activity; and (4) the low number of people in the area. *Id.* at 561; *see also United States v. Sewell*, 381 F. App'x 159, 161

---

[9] The intersection at issue is a five-point intersection. What Detective Walcott identified as the Harbor View road (the road from which Defendant came) and Rattan road (the road on which Defendant ultimately began heading west before he was stopped) are on roughly opposite sides of the intersection, with North Shore Road adjacent to each. (*See* Government Exh. 1).

[10] In arguing that Defendant was not legally required to use his signal light, Defendant notes that: "[N]o other motorist was in a position to be affected by [Defendant's] driving pattern. . . . There were no other vehicles in the opposite lane of traffic. Additionally, there was no testimony offered that any other vehicles were behind [Defendant]." (Dkt. No. 49 at 3 (omitting internal citation)).

(3d Cir. 2010) (finding that reasonable suspicion was established where late at night an officer observed the defendant jogging away from the location of recently reported gunfire and then begin acting nervously when he noticed the police car).

Similar to *Goodrich*, the relevant activity here occurred late at night—around 11:00 p.m. Further, while there was no evidence of the level of crime in the Harbor View apartment area, Detective Walcott observed the jeep—driving erratically—in close geographical and temporal proximity to the location of gunfire. Indeed, much less than the seven minutes in *Goodrich*, Detective Walcott testified that he was in a position to observe the jeep approximately ten seconds after hearing the gunfire. (Tr. 46). Moreover, the record suggests that there were no other vehicles in the area. (*See* Tr. 8, 51). As in *Goodrich*, these facts are sufficient to support a finding of reasonable suspicion.[11]

Other circuits have similarly found reasonable suspicion in analogous contexts. *See, e.g.*, *United States v. Williams*, 619 F.3d 1269, 1271-72 (11th Cir. 2010) (finding that reasonable suspicion was established by the sound of a nearby gunshot in a high-crime area and observing a single vehicle quickly leave the area, and noting that "[w]hen [the officer] saw a lone vehicle

---

[11] In arguing that reasonable suspicion did not exist, Defendant points to certain factors that were not present: Defendant could not have been fleeing police because Detective Walcott's police vehicle was unmarked; there was no evidence that Defendant was traveling in excess of the speed limit; and there was no evidence of the nature of the neighborhood, *i.e.*, that it was a high-crime area. (Dkt. No. 47 at 10). However, the absence of these particular factors is not dispositive. The issue is not whether these particular factors are present; but rather, whether considering the totality of the circumstances, reasonable suspicion as defined in the applicable law exists. *Sokolow,* 490 U.S. at 8. This Court has concluded that the circumstances here, as discussed above, satisfy the legal standard.

Defendant also notes that "there was no testimony that Officer Walcott had any experience in investigating shootings." (*Id.*). In addition to the questionable accuracy of this statement (Tr. 6 (see reference to testimony regarding firearm investigations)), the situation here—where an officer hears gunshots and observes a vehicle erratically driving away from the area of the gunshots—is not one that requires specialized expertise.

hurriedly pulling out of a high-crime housing project in the middle of the night within seconds of a gunshot, it was eminently reasonable of him to suspect that the car's occupants might have committed a crime"); *United States v. Bolden*, 508 F.3d 204, 206 (5th Cir. 2007) (finding that reasonable suspicion was established by the sound of nearby gunshots, tip that people were firing weapons nearby, and observing vehicle quickly driving away from the area of the gunshots, and noting that "when an officer sees a solitary vehicle containing more than one person leaving the precise spot where that officer has good reason to believe that multiple persons were shooting less than a minute before, it is more than a 'hunch' that those in the vehicle may be involved in the shooting") (omitting footnote); *United States v. Henning*, 906 F.2d 1392, 1395 (10th Cir. 1990) (finding that reasonable suspicion was established by observing a lone car quickly leave "the general area of an early morning gunshot heard by officers only seconds earlier" in a high crime area).

Defendant argues that the Court cannot conclude that Detective Walcott possessed reasonable suspicion to justify stopping the jeep because Detective Walcott "described [Defendant's] actions in two very different manners." (Dkt. No. 47 at 9). Defendant supports this contention based on the differences between Detective Walcott's description of the path of the jeep on direct examination and his description in the police report and probable cause fact sheet. (*Id.* at 9-10). Specifically, on direct examination, Detective Walcott testified that the jeep, without signaling, made a sudden "jerk" turn onto North Shore Road into the wrong lane of traffic, and cut through a gas station parking lot to reach Rattan Road on which it traveled west. (Tr. 8-9). On cross examination, Detective Walcott testified that his police report and probable cause fact sheet indicate that the jeep "turned with a jerk movement without signal and reversed back onto North Shore Road" before traveling west down Rattan Road. (Tr. 50, 53). Detective Walcott further

testified that neither his police report nor the probable cause fact sheet mention the jeep cutting through the gas station parking lot to reach Rattan Road. (Tr. 51, 53). Defendant argues that because "the Court cannot conclude what set of acts [Defendant] took that night, the Court cannot calculate whether his actions rose to the level of reasonable articulable suspicion." (Dkt. No. 47).

While the Court recognizes that there was an apparent inconsistency between Detective Walcott's direct examination testimony and his police report and probable cause fact sheet concerning the path that the jeep took as it crossed North Shore Road to Rattan Road, the Court does not agree that this precludes a finding of reasonable suspicion. To the contrary, while the Court does not minimize the apparent inconsistency, such an inconsistency in the details regarding the precise path taken by the jeep as it suddenly changed direction after making a jerking turn onto North Shore Road does not negate the fact that the jeep was being driven erratically.[12] Nor does such an inconsistency negate the context in which the erratic movement of the jeep occurred— around 11:00 at night; after emerging from an area where gunfire had been heard only approximately ten seconds earlier; and with no evidence of other traffic in the area. Thus, when the circumstances are viewed in their totality, Defendant's argument does not alter the Court's conclusion that there was the requisite reasonable suspicion to stop the jeep.[13]

---

[12] In other words, whether the jeep reversed on North Shore Road and went across onto Rattan Road, or went into the wrong lane of traffic on North Shore Road and cut across a gas station parking lot to Rattan Road, there was some unusual movement by the jeep that, together with the other factors, reasonably attracted Detective Walcott's attention. Under either scenario, the fact remains that there is evidence that the jeep turned with a sudden jerk onto North Shore Road only to suddenly change direction moments later and resume traveling in a westerly direction.

[13] Defendant points to this inconsistency regarding the path of the jeep and three other alleged inconsistencies between Detective Walcott's testimony and his police report and probable cause fact sheet to argue that the Court cannot credit any of Detective Walcott's testimony. (Dkt. No. 47 at 2-5). The Court disagrees. Notwithstanding these four credibility challenges—all except one of which pertain to not mentioning certain details of his testimony in his police report and/or probable cause fact sheet—the Court finds that, in its totality, Detective Walcott's testimony was credible.

Based on this Court's review of the "whole picture"—as the "totality of the circumstances" analysis mandates[14]—the Court concludes that Detective Walcott had "reasonable suspicion supported by articulable facts that criminal activity may be afoot" and that Defendant was involved therewith. *See Mathurin*, 561 F.3d at 173 (quoting *Sokolow*, 490 U.S. at 7) (quotations omitted).[15] Accordingly, Detective Walcott was authorized to stop and briefly detain Defendant to investigate the gunfire. Defendant's arguments to the contrary are thus rejected.

### B.    *Miranda* Warnings

After Detective Walcott stopped the jeep, he asked Defendant several questions without first advising him of his *Miranda* rights. Specifically, Detective Walcott asked Defendant whether he knew anything about the gunfire; whether he had any firearms or illegal items in the jeep; and whether he had a license to carry a firearm in the U.S. Virgin Islands. (Tr. 14-15). Defendant answered that he had heard the gunfire, but indicated that he did not have any weapons in the jeep and did not have a firearms license. (Tr. 15). Defendant argues that his responses to these questions were obtained in violation of his *Miranda* rights and must be suppressed. (Dkt. No. 28 at 7-8). The Government counters that *Miranda* is inapplicable because Defendant was not in custody when he

---

[14] *See Sokolow*, 490 U.S. at 8.

[15] In view of the Court's finding in this regard, Defendant's arguments that Detective Walcott impermissibly extended the traffic stop by investigating Defendant's connection to the gunfire "in lieu of issuing a citation" for the allegedly illegal turn must also fail. (Dkt. No. 47 at 7). As Detective Walcott testified, he informed Defendant that he was stopped because he had "made a turn without using his signal light, *and* that he was coming from the area of where rapid gunfire . . . had happened." (Tr. 14 (emphasis added)). The Court's finding that the stop here was justified by reasonable suspicion of Defendant's involvement with the recently heard gunfire renders investigation of the gunfire legitimate. Accordingly, Detective Walcott did not impermissibly prolong the stop by investigating his suspicions regarding the gunfire and his actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Goodrich*, 450 F.3d at 558 n.6 (quoting *Terry*, 392 U.S. at 19-20).

made the statements. (Dkt. No. 31 at 4). The Court concludes that Defendant's responses were not obtained in violation of *Miranda*.

### 1.  Applicable Legal Standards

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established the now well-recognized legal principle that under the Fifth Amendment the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the [g]overnment." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion) (internal citations omitted). A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (quotations omitted). Courts also examine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 456-57 (3d Cir. 2015) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012)) (quotations omitted). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

### 2. Analysis

The Court finds that Defendant was not in custody for purposes of *Miranda* at the time he made the challenged statements. The record shows that the questioning of Defendant was brief, and that during the questioning Detective Walcott was using a normal tone of voice, was standing about two to three feet in front of Defendant, and his firearm remained holstered. (Tr. 15-16). Moreover, when Defendant was questioned and he provided responses, he was not handcuffed or physically restrained in any way. (Tr. 22). Because Defendant's freedom of movement was not restrained to "the degree associated with a formal arrest," Defendant was not in custody and the requirements of *Miranda* were not triggered. *Leese*, 176 F.3d at 743 (quoting *Beheler*, 463 U.S. at 1125) (quotations omitted).[16]

At the suppression hearing, Defendant argued that he was in custody for *Miranda* purposes primarily because he was stopped at night in a poorly lit area; there was no evidence that other traffic was around; there were two officers standing nearby when he was questioned; and he was standing in between the jeep and the unmarked police car (which the record shows were about a car length apart). (*See* Tr. 55, 140-142).[17] The Court finds this argument unpersuasive.

---

[16] At the suppression hearing Defendant asserted that because Detective Walcott's questions related to the investigation of the gunshots and not the traffic violation, the situation was distinguishable from that of an ordinary traffic stop. (Tr. 140). This is a distinction without a difference. Regardless of whether an individual is stopped for a suspected traffic violation or for some other criminal activity, an individual is not in custody for *Miranda* purposes unless "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Leese*, 176 F.3d at 743 (quoting *Beheler*, 463 U.S. at 1125) (quotations omitted); *see also Berkemer*, 468 U.S. at 437-40.

[17] Defendant also argued that because Lieutenant Matthews was standing behind Detective Walcott at the time of the questioning, Detective Walcott could not testify as to "what, if anything, the other officer [was] doing that might" have triggered the protections of *Miranda*. (Tr. 145-46). What, "if anything" Lieutenant Matthews was doing that "might" have triggered *Miranda* clearly is not evidence that Defendant was in custody for *Miranda* purposes. And, the absence of evidence

14

The facts Defendant highlights are insufficient to indicate that a reasonable person in Defendant's situation would have felt restrained to the degree associated with a formal arrest, especially in light of the countervailing factors noted above. Noticeably absent are any facts showing that Defendant was subjected to the type of "inherently coercive pressures" that would render him in custody. Nor do the facts highlighted by Defendant otherwise suggest a forceful, overbearing or threatening atmosphere, or any type of restraint to the degree associated with a formal arrest.[18] Here, the questioning was brief and conducted in a normal tone of voice; Detective

---

regarding the precise actions of Lieutenant Matthews is insufficient to negate the evidence in the record establishing that Defendant was not in custody for *Miranda* purposes.

[18] *See Berkemer*, 468 U.S. at 442 (holding that a motorist was not in custody during a traffic stop and noting that "a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.") (omitting footnote); *Arena*, 629 F. App'x at 456-57 (finding that individual suspected of tax evasion was not in custody in part because at the time of questioning no guns had been drawn and the individual had not been handcuffed, booked, photographed, or fingerprinted); *United States v. Campbell*, 741 F.3d 251, 266 (1st Cir. 2013) (noting that "as a general rule, *Terry* stops do not implicate the requirements of *Miranda,* because *Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings" (quoting *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986)) (quotations omitted)); *United States v. McNeil*, 416 F. App'x 227, 229 (3d Cir. 2011) (affirming district court's finding that a defendant was not in custody where he "had been stopped by police . . . [but] had not been told he was in custody, had not been placed in handcuffs or told to sit inside a police cruiser. No officer had drawn his gun. The events occurred on a public way, shortly after [Trooper] Langman stopped defendant's car."); *cf. United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (holding that a defendant was in custody when six officers arrived at his apartment and placed him in handcuffs); *United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (holding that the defendant was in custody where police "forced [him] out of his car and onto the ground at gunpoint"); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (concluding that the defendant was in custody where he was questioned about his ties to a bank robbery "while sitting handcuffed in the back of a police car"); *United States v. Fautz*, 812 F. Supp. 2d 570, 619-20 (D.N.J. 2011) (holding that defendant was in custody during warranted search of his apartment in which police entered the apartment with guns drawn and "the entire premises was visibly subject to the unquestioned command of the officers" and the defendant "was effectively prevented from moving by the [police] team surrounding him, both initially when they entered with weapons drawn and immediately thereafter when they continued to detain him with weapons holstered").

Walcott never drew his weapon; and Defendant, who was not handcuffed, was standing behind his jeep. (Tr. 15-16, 22).

In sum, the circumstances here were not of the nature to trigger the protections of *Miranda*. Accordingly, Detective Walcott did not violate the requirements of *Miranda* by questioning Defendant, without the benefit of *Miranda* warnings, after he stopped the jeep.

### C.      Search of the Jeep

Following Detective Walcott's questions and Defendant's answers, as discussed above, Detective Walcott asked for and was refused consent to search the jeep. (Tr. 17). He then walked around to the passenger-side door of the jeep. (Tr. 17). Using his flashlight, Detective Walcott peered into the jeep and observed a rusted magazine within a partially opened black bag on the passenger-side floorboard. (Tr. 17-18). Based on this observation, the magazine and the gun connected thereto were seized; the jeep was searched; and the remaining evidence was discovered.

The Government contends that the discovery of the magazine is permissible under the plain view doctrine and, accordingly, the subsequent search of the vehicle was based on probable cause and was lawful under the automobile exception. (Dkt. No. 31 at 3; Dkt. No. 44 at 4, 6). Defendant counters that the search of the jeep was not justified because Detective Walcott's discovery of the magazine does not fall within the purview of the plain view doctrine. (Dkt. No. 47 at 11-15).

The Court concludes that Detective Walcott permissibly viewed the magazine, its illegality was immediately apparent and, therefore, the subsequent search of the vehicle was proper.

### 1.   Applicable Legal Standards

The "plain view" doctrine permits police to conduct a warrantless seizure of private possessions where three requirements are satisfied. *Horton v. California*, 496 U.S. 128, 141 (1990). First, the officer must be lawfully in the place "from which the evidence could be plainly

viewed." *Id.* at 136. Second, the officer must have a "lawful right of access to the object itself." *Id.* at 137. Third, the incriminating nature of the object must be "immediately apparent." *Id.* at 136; *see also United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citing *United States v. Menon*, 24 F.3d 550, 559-60 (3d Cir. 1994) (recognizing *Horton*'s three-part test)).

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). However, it is well established that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Id.* (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)) (quotations and ellipses omitted); *see also United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) ("The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" (quoting *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir. 1991), *abrogated on other grounds by United States v. Caraballo–Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc))). "[I]f probable cause justifies the search, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Donahue*, 764 F.3d at 300 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)) (quotations and ellipses omitted).

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" *Id.* at 301 (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)) (quotations omitted). In determining whether probable cause existed, courts are to evaluate "the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (quotations, brackets, and ellipses omitted). "If there was

17

a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." *Id.* (quoting *Gates*, 462 U.S. at 238).

### 2. Analysis

Defendant's primary argument is that the plain view doctrine is inapplicable to Detective Walcott's discovery of the extended magazine because "the incriminating nature of the rusted metal in the black bag was not immediately apparent." (Dkt. No. 47 at 12).[19] Defendant first asserts that, based on the Government's photographs of the partially opened black bag inside the jeep that were admitted as exhibits, "[i]t is clear . . . that the firearm was not immediately recognizable from [Detective] Walcott's position." (*Id.*). However, Detective Walcott's uncontested testimony is that when he saw the magazine, "it immediately rang a bell in my head, because I have seen one of these magazines before in my career. I have actually recovered one just like it. . . . [p]robably sometime earlier in the year." (Tr. 21).[20] The fact that it was immediately apparent to Detective

---

[19] Defendant also argues that Detective Walcott was not lawfully in a place to view the rusted magazine because the initial stop was illegal and that, in any event, his discovery of the magazine was not inadvertent. (Dkt. No. 47 at 11). However, as discussed above, Detective Walcott had reasonable suspicion that Defendant was involved with the nearby gunshots and, therefore, a brief investigatory stop of the jeep was warranted. During this investigatory stop, it was lawful for Detective Walcott to walk to the passenger-side window of the jeep and illuminate the inside with his flashlight. *United Sates v. Whitney*, 350 F. App'x. 627, 629-30 (3d Cir. 2009) ("[i]t is . . . beyond dispute that [the police officer's] action in shining his flashlight to illuminate the interior of [the defendant's] car trenched upon no right secured to the latter by the Fourth Amendment" (quoting *Texas v. Brown*, 460 U.S. 730, 738 (1983)) (quotations omitted)); *see also United States v. Cole*, 2010 WL 724382, at *2 (D.V.I. Mar. 1, 2010) ("Shining a flashlight to illuminate the interior of a suspect's car does not violate any privacy right secured by the Fourth Amendment."). As to Defendant's second argument, the plain view doctrine does not require that the evidence be viewed inadvertently. *Horton*, 496 U.S. at 130 ("We conclude that even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition.").

[20] Defendant's suggestion that, because Detective Walcott noted seeing and recovering a magazine of this nature only once before, he was incapable of recognizing a similar one in this instance is wholly unpersuasive. (*See* Dkt. No. 47 at 12).

Walcott that the object in the bag was contraband is further supported by the fact that upon seeing it he "immediately yelled 'gun.'" (Tr. 21).

Defendant nonetheless maintains that the photograph of the black bag labeled as Government Exhibit 4 "demonstrates how little of the rusted metal was visible to [Detective] Walcott as he looked into the window with his flashlight." (Dkt. No. 47 at 13). While the photograph admittedly shows that the magazine was only partially visible, this alone is insufficient to challenge Detective Walcott's testimony, fueled by his prior experience, that he immediately recognized the object as a magazine. (Tr. 21). Moreover, under the applicable law, Detective Walcott was not required to ascertain with absolute certainty that the object within the bag was contraband. Rather, the proper inquiry is whether viewing the object in the bag, under the totality of the circumstances, gave rise to probable cause that the object was illegal. *United States v. Telfair*, 507 F. App'x 164, 172 (3d Cir. 2012) ("To satisfy the 'immediately apparent' prong [of the plain view doctrine], the police must have probable cause to believe the object in plain view is contraband."); *see also Donahue*, 764 F.3d at 301 (noting that the probable cause inquiry "is based on the totality of the circumstances"). Given the existence of gunfire, Detective Walcott's reasonable suspicion—based on the additional factors discussed above—that Defendant was involved with the gunfire, Detective Walcott's prior experience with a similar magazine, and Defendant's admission that he did not have a firearms license, Detective Walcott's sighting of the object within the open bag gave rise to the "fair probability" of illegality necessary to establish probable cause. *See Donahue*, 764 F.3d at 301 ("If there was a 'fair probability that contraband or evidence of a crime' would have been found, there was probable cause for the search." (quoting *Gates*, 462 U.S. at 238)).

Defendant also argues that the illegality of the magazine in the bag was not immediately apparent to Detective Walcott because, at the time he observed the magazine, he did not know whether Defendant had a firearms license.[21] (Dkt. No. 47 at 14). Defendant concedes, as he must, that Detective Walcott testified that Defendant told him that he did not have a firearms license before the magazine was discovered. (*Id.*). However, Defendant asserts that the Court cannot credit this testimony because it is "directly contradict[ed]" by Detective Walcott's actions. (*Id.*). Defendant points to Detective Walcott's testimony on cross examination that he called Detective Stout sometime after he discovered the magazine and that his police report and probable cause fact sheet state that, "after [Detective] Saldan[o] found the firearm, a verbal check was made with Detective Stout about whether or not [Defendant] had a license to carry a firearm." (Tr. 62). Defendant asserts that the subsequent call to Detective Stout reveals that Defendant never admitted he was not licensed to carry a firearm. (Dkt. No. 47 at 14). The Court finds this argument unpersuasive.

Contrary to Defendant's assertion, nothing in the record either directly or indirectly contradicts Detective Walcott's testimony that—prior to the discovery of the magazine—Detective Walcott asked Defendant whether he had a firearms license and Defendant responded "no." (Tr. 15). Defendant's argument is premised on the assumption that the *only* reason a verbal check with Detective Stout would have been made is if Detective Walcott had not previously learned that Defendant lacked a firearms license. There is nothing in the record to support this assumption. It is pure speculation.

---

[21] In the Virgin Islands, the mere fact that someone possesses a gun is not sufficient to establish probable cause of criminal activity. *See Ubiles*, 224 F.3d at 218.

Based on the foregoing, the Court concludes that Detective Walcott lawfully observed the magazine when he shined his flashlight into the jeep's passenger-side window, and that the illegality of the magazine was immediately apparent. This observation gave Detective Walcott probable cause to believe that the jeep contained contraband, specifically an unlawfully possessed gun and ammunition. Accordingly, the subsequent search of the jeep was permissible under the automobile exception, and the evidence received—*i.e.* the magazine, firearm, ammunition, marijuana and drug paraphernalia—was lawfully discovered. *See Donahue*, 764 F.3d at 300 ("[I]f probable cause justifies the search, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (quoting *Ross*, 456 U.S. at 825 (quotations and ellipses omitted))).

### III.   CONCLUSION

For the reasons stated above, the Court will deny Defendant's Motion to Suppress Statements and Physical Evidence. An appropriate Order accompanies this Memorandum Opinion.

Date: May 6, 2016

_____/s/_____
WILMA A. LEWIS
Chief Judge